In re KESSLER & CO.

(District Court, S. D. New York. December 8, 1908.)

BANKRUPTCY (§ 155*) — ADVERSE CLAIM TO PROPERTY — TRANSACTIONS CONSTRUED.

The bankrupt firm arranged to extend credit to a firm of fruit importers in New York to enable them to purchase fruits from a dealer in London, the business being transacted as follows: Whenever the London dealer ' sold a consignment of fruit to the importers, he delivered the bill of lading, with a draft on the importers attached, to claimants in London, who thereupon, in accordance with the arrangement with the bankrupts, paid his check for the amount, charged the same to the bankrupts, and forwarded to them the bill of lading and draft on the importers. At the time of bankrupts' failure it happened that claimants had forwarded a bill of lading, but through some defect in the papers had not forwarded the draft, which they received later and retained. The bill of lading came to the bankrupts' receiver, who obtained the goods thereon. *Held*, that by such arrangement and transactions claimants did not become the owners of the draft or bill of lading, but merely took the same on account of bankrupts; the effect of each transaction being only to make bankrupts their debtors for the sum advanced, and that claimants could assert no rights against the trustee because of the receipt by him of the consignment or its proceeds.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 155.*]

In Bankruptcy. On motion to confirm report of Peter B. Olney, special master, on petition of United States Mortgage & Trust Company..

On October 30, 1907, Kessler & Co. (hereinafter called Kessler) committed an act of bankruptcy by making a general assignment for the benefit of creditors. Petition was filed against them, and they have been duly adjudi-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cated. In August, 1907, Kessler issued to Sgobel & Day (hereinafter called Sgobel) a letter of credit for £2,000 in favor of one Rodriguez of London. Of this credit Kessler advised Glyn, Mills, Currie & Co., also of London (hereinafter called Glyn), and closed their letter of advice by forwarding a "press copy of the letter of credit, and recommending all drafts valued on you there against to your kind protection to our debit." The business thus arranged for was, and was expected to be, transacted as follows: Sgobel bought grapes of Rodriguez for importation into the United States. On receiving an order from Sgobel, Rodriguez shipped the grapes, and delivered to Glyn the bills of lading indorsed in blank and a draft on Sgobel for the agreed price. He then drew a check on Glyn for the amount of the draft, and received cash therefor. Glyn immediately charged Kessler with the amount so advanced, and forwarded bills of lading and draft to Kessler. Kessler had long been engaged in this business, and paid Glyn a yearly salary for transacting London business of this nature.

Some time prior to October 30, 1907, Rodriguez, having made a shipment of grapes, applied to Glyn for payment against usual documents. Owing to an inaccuracy in some of the papers, he did not give Glyn the draft on Sgobel, but surrendered his bills of lading duly indorsed in blank, and obtained from Glyn the usual payment. Glyn immediately forwarded to Kessler the bills of lading by mail, stating that the draft would follow. The amount so paid Rodriguez without receipt of draft Glyn immediately charged to Kessler's account. Some days later Rodriguez brought in his draft, but before Glyn forwarded the same to Kessler he learned of the latter's failure. Thereupon the draft was sent to the present petitioners, with instructions to collect for Glyn's account.

Meantime the receiver in bankruptcy in due course of mail had received the bills of lading. When the draft came forward Sgobel refused to pay except out of the proceeds of the property covered by the bills of lading, which property, however, was in the receiver's possession under said bills. This proceeding was brought to determine the respective rights of Glyn and Kessler's trustee.

Wallace MacFarlane, for trustee.
Herbert Barry, for petitioner.

HOUGH, District Judge (after stating the facts as above). The course of business above outlined is well known, and, were it not for the unusual circumstance of the draft and accompanying bills of lading falling into different hands, no formal opinion would seem necessary.

The petition clearly asserts the supposed legal basis of petitioner's demand, viz., that Rodriguez either discounted his draft with Glyn, or that Glyn purchased the same from Rodriguez. I perceive no legal difference in these two statements of petitioner's position. To me the foregoing statement of the business arrangements made, the contracts entered into, and the cotemporaneous interpretation thereof by the parties, constitute a sufficient answer to the proposition. Rodriguez did not discount the draft with Glyn; he merely deposited it for transmission to Kessler, and obtained' upon such deposit the entire amount of the draft, without diminution, discount, interest, or commission; and this was the result of an arrangement or contract between Glyn and Kessler, to which Rodriguez was not a party at all, and in which Sgobel was but indirectly interested. Nor did Glyn purchase Rodriguez's draft; he merely advanced the money, not on the draft but on the letter of credit. He did nothing more than Kessler himself would have done had he personally had an office in London, and what- .

ever Glyn did was solely for Kessler's account, and the immediate legal effect of his act was to make Kessler, and no one else, his debtor.

The acts of parties in interest, when they anticipate no trouble, is one of the best criteria for interpreting the contracts they make. To Glyn (when he paid out his money) it was a matter of indifference whether the grapes mentioned in the bill of lading spoiled or whether they were worth the advance, or whether Sgobel was or was not good for the amount of the draft—these matters were for Kessler alone; it was he who chose to extend credit on the combined security of the marketability of the grapes and the solvency of Sgobel, no one else. If, as I think apparent, Glyn neither discounted nor purchased the draft, he did not own it when it was delivered to him, and there is nothing in the mere fact of Kessler's subsequent failure to confer an owner's title upon him. In this view it would have made no difference had Glyn retained in his possession both the draft and the bills of lading until after Kessler assigned; Glyn would still have owned none of these documents. Whether, in view of Kessler's indebtedness to him, Glyn might, by appropriate legal proceedings, have recouped himself out of Kessler's property in his hands, upon some theory of lien, need not be discussed; it is enough for this litigation that he did not own either the draft or the bill of lading, and the doctrine of Muller v. Pondir, 55 N. Y. 327, 14 Am. Rep. 259, does not apply.

This litigation, however, may, I think, properly be decided upon another and narrower ground. When Glyn paid Rodriguez certain money for Kessler's account and charged up the amount so paid to Kessler, he took the bills of lading for the express purpose of forwarding the same to Kessler in order that the latter might have the legal title thereto as collateral security for what Sgobel owed him, which was the same sum (in part) that Kessler owed to Glyn. This contractual arrangement was actually carried out, and the moment the bills of lading were deposited in the mail, duly directed to Kessler, the delivery to the latter was complete and Kessler's title perfect, and whatever enforceable rights Glyn might have had while in possession of the bills of lading and after Kessler's assignment were wholly extinguished by such delivery. The promised subsequent forwarding of the draft was something that Rodriguez might have attended to himself, and, so far as Glyn was concerned, it was by his own statement a purely formal act. The bargain was complete, the contract was executed, when the bills of lading were received, paid for, and forwarded to Kessler. It is of course generally true that as between a draft secured by collateral and the collateral itself the former is the principal obligation, but there is nothing unlawful in the reversal of this situation by contract, and that was the case here.

The master's report in favor of the trustee in bankruptcy is confirmed, and final order directed in accordance therewith, including the recommendations as to costs and disbursements.